24-1241 Case Leroy v. Center for Individual Rights and Center for Individual Rights v. Livingston Manor Central School. I guess actually I take that back Center for Individual Rights is a family of some sort. I read the caption wrong. Mr. Dorfman. May I please the court. My name is Jerome Dorfman. I'm representing the appellant in this case. I was the attorney that brought this case initially in the New York State court and it was removed to the federal court. I am familiar with the case. Could you move the microphone down just a little bit or speak up just a little bit? Is that better? I think if you could project that would be great. Thank you. I am familiar with every aspect of this case. However, the court has allowed us to break our argument into two parts. So I will be addressing the facts part of the case and answer any questions the court may have regarding that. And I will defer to the distinguished scholar Eugene Volokh who you have allowed to address the legal aspects of the case. And he is the amicus counsel, one of the amicus, one of the five amicus counsel on this case. This case involves obviously the case of Mahanoy which the Supreme Court announced right about the time when we obtained an preliminary injunction against the defendant in the case. Mahanoy opened up a situation where they said all but said if it doesn't have anything to do with the school it's really none of your business. They left to open the door for a few things that might come up that were unanticipated at all. However, this case presents a situation with the purest set of facts you will ever see for having no exception to disciplining a student for off-campus speech. Can I ask whether, so your suit asks for punitive damages under 1983. Can you explain to me how we were able to award these against the DOE or against the municipal officers? How we were able to ask for punitive damages? That actually was part of a claim for defamation in under state law. And so we were asking for punitive damages on that defamation claim. We have not asked for punitive damages. I don't believe that it can be awarded under these circumstances in a civil rights case. But this is a case where there is absolutely no connection between the student's speech off campus and the school. It doesn't involve the building, the school, its faculty, its students, its employees. It doesn't have anything to do with the school. He was away from school. He was using his private phone, his private Snapchat account, and did not mention anybody in the school, didn't mention the school building. There's just zero connection between the facts of this case and the school. And that's what distinguishes this case from every other case that has been decided on this point. The point is that there was a cheerleader case. There was someone who had armbands in school. We had a banner at a school event. But this was not at a school event. This was not dealing with anything to do with the school. This is the purest set of clear facts with nothing to do with the school, with the school discipline the student for out of school speech. And if that is allowed, then they can, anything a student says outside is fair game for a school to punish him with a discipline. No matter what he says, he has to be careful what he tells his friends. So in this case, that's it. All there is to do. At this point, I will defer to Mr. Volokh. Thank you. Appreciate your argument. Thank you. Thank you, Your Honors. Eugene Volokh representing Amici Center for Individual Rights and myself. So the Mahanoy case states that schools face a heavy burden when they regulate, when they punish students for out of school speech. Suppose instead of this photograph of a lynching, there's a photograph of a man who was dressed up like he was in Hamas, holding an automatic rifle to a Jewish woman. And the statement was, we've got another one, and posted that on the video. Same result? Your Honor, we would say that much as we would revile the message in that photograph, speech that is pro-Hamas, speech that defends even murder abroad, is constitutionally, we think it's constitutionally protected. And part of the reason is, in fact, actually, you brought up the Hamas example. There's lots of speech that is currently being engaged in, including, we suspect, by high school students, that strongly supports the Palestinian cause, in fact, makes apologies for Hamas or even praises Hamas. There's also lots of speech that strongly supports the Israeli cause and says, well, you know, there are Palestinians who are dying as a result. That's what happens in war. All of it could cause potential disruption on campus. That cannot be a basis for suspending a student for engaging in such activity. Go ahead, please. Okay, suppose the photograph is posted on social media, spreads through the school. The school is 15% Jewish. The principals line the lights up. There's a dangerous atmosphere. My kid is going to a school that's permeated with rising anti-Semitism. Unless we make a stand against it, it will only get worse. Same result? Your Honor, we think it would be the same result, although we should note, if the photograph seems to suggest that this person is actually threatening violence against particular students in school, it's sort of, here's a targeted thing, here's my kill list of Jewish students, or I think all my Jewish classmates should be beaten up or shot, that would fit in the category that Justice Alito, I think, quite correctly identifies, of specific and targeted speech aimed at particular, aimed in the sense of talking about and perhaps bullying or harassing specific students, specific identified students. Can I ask about, I mean, I'm really interested in this sort of line between what we would call true threats in the sort of regular First Amendment context and something else that feels kindred. Let's take the example of somebody glorifying killing Jewish people, sort of like the Siegfried case, I suppose, the Tenth Circuit, using weapons, suggesting an intent to kill Jewish people. But it's not particularized to any individual. But as a result of that imagery, students are terrified to go to school with this person who may well be armed and has expressed very publicly a level of dislike of Jewish people that's so great that he would threaten violence. So the Jewish students stop going to school. Does that trigger some interest in the school that would be heightened enough to overcome the sort of off-campus nature of the communication? Yes, Your Honor, potentially. And I think you're quite correct in identifying this as the line between threats and other speech, that indeed certain kinds of speech could be reasonably perceived as a threat of violence, perhaps somewhat indirect, perhaps that might take into account in some measure. So another one? I mean, I want you to answer that question, but another one isn't a threat? Your Honor. Answer her question, but know that that's what's in my head. Another one isn't close. Yes. Yes, Your Honor. So if indeed it is something which a reasonable person would perceive as this person is threatening to attack me or other people like me at school, that might be punishable. But it would have to be punishable because it's threatening, not because it's anti-Semitic. Whereas in this case, it was clear that the complaints were that this was perceived as racist. This was essentially perceived as making light of a very serious problem of racial, race-based police brutality. So there was the message that was upsetting because of its viewpoint, Your Honor, I think, and not because of it. How does that work, though? Because usually the viewpoint discrimination comes in the context of an open forum where someone says, oh, we're only giving X amount of time to a Y person and we're not giving Z amount of time. How are you – it feels like it's not a very good fit here. Your Honor, you're quite right that as a general matter, outside of a government-provided forum, when we're talking about speech on Snapchat or speech on private property, generally the requirement isn't just viewpoint neutrality on the part of the government. It's content neutrality. So generally speaking, when it comes to government regulations of Snapchat, you don't even need to focus on viewpoint neutrality because any content discrimination is impermissible. One of the things that Justice Alito, I think, highlights in his concurrence, and I think quite correctly, is that when there's student speech that's not expressly and specifically directed at the school, fellow students and the like, that kind of speech cannot be restricted because it offends people, because it conveys a viewpoint that people find racist or anti-Semitic or anti-Palestinian and the like. So if there had been real reason to think that this person was actually threatening violence against classmates, that might be a different situation. And then presumably the school's answer would be – Who gets to decide that? Pardon? Who gets to decide how safe that students need to feel? Do the administrators – I mean, do the administrators get to be the ones that, when making a call between whether or not something is close enough to a threat that they need to act, or is it the speaker? Your Honor, I think ultimately it would have to be the courts, although in the first instance the administrators would be the ones applying the line. One reason I say the courts is because Bose Corporation v. Consumer's Union generally says there needs to be independent appellate review, even of trial court decisions, and certainly, I think, of administrator decisions. Part of the problem is that, especially – I mean, I think we've heard a lot of this over the last ten or so years. Very many objections to viewpoint can be recast as objections about safety. Like somebody might say, this person, all they've done is they've praised Hamas. I feel unsafe, because they're praising people who are notorious for murdering Jews. That cannot be an adequate basis for an administrator to say, well, we think that they feel unsafe. So that's why it needs – Even if we were to agree with that, is there something substantively different about someone on the ground and somebody saying another one? Your Honor, under certain circumstances it might be. Like, for example, if there was some uncertainty about who the person was and there was some suspicion that this was documenting some attack on a classmate, but when one person visibly kind of goofing around with a friend is – goofing around, I simply mean that this was not meant as a serious violence against a friend. So one person posing with a friend is perhaps making light of police brutality. We don't think that that would be a sign of a threat of violence against other classmates that, oh, this is something I will do to you at school. I mean, we don't necessarily get into the speaker's head when we're looking at the communication. Does it really turn on whether – what if he wasn't joking? What if this was intended as a shot across the bow to black people generally, including his classmates? Does that matter? Does that change the analysis? Your Honor, under the true threats analysis, there would be two components. One is a reasonable person has to perceive it as a true threat of criminal conduct and not just as hyperbole or some such. That's the Watts case, the hyperbole case. The second component from Counterman is there has to be recklessness. So this person has to know there's a substantial chance that someone would perceive it as a threat and then barrel along despite that. So there's both a subjective and an objective component. We think that neither of these is present here, that in context a reasonable person might well perceive it as the ACLU brief identifies as making light of police brutality, and that might be understood by a reasonable person that way and therefore might be seen as an offensive viewpoint that causes the school to be upset with this person. Let me ask you this. Are we not getting overtaken by technology in this sense? Does the inside and outside of school dichotomy that we've thought about for years no longer make the kind of sense that it did before? A student can walk out of the schoolhouse door, walk across the street, turns on the iPhone, on social media, classmates in school are reading it, reacting to it, and so forth. So how do we think about the inside and outside dichotomy when we're dealing with current iPhones, which everybody has? Yes, Your Honor. So we think that there are several ways of understanding the situation you've described. One is there are some differences of degree, but this is not new as a matter of kind. This is not new as a matter of kind as opposed to just degree. So, for example, imagine that in 1969 the Tinkers wrote an op-ed or wrote a letter to the editor, more likely. That newspaper could easily be brought onto campus. Students could say, oh, did you see what our classmates were writing? That can't make a difference. The second component that we think is important is the Mahanoy majority stresses that regulations of off-campus speech include all the speech a student utters during the full 24-hour day. So the other thing that we think is preserved here is it's one thing. Tinker says that students' rights don't stop at the schoolhouse door, but outside the schoolhouse door they have to be more preserved. You're quite right that things outside the schoolhouse door may still be talked about, certainly, and read and seen perhaps on campus, but that cannot justify the school asserting 24-7 control over a person. Well, I suppose it's not really 24-7 control of everything. Students can communicate in forums that aren't social media where things go viral if they're sufficiently controversial. I mean, this isn't suggesting that if the same student took that same picture, showed the caption, was sitting in a restaurant with a friend and showed it to them, that that would be within the schools. Your Honor, I'm not sure my college-age students are capable of communicating other than on the Internet. But, Your Honor, but certainly the Internet for everybody is a tremendously important medium today, and to say to people that, well, you're still free to write that letter to the editor of a newspaper so long as it doesn't appear on the newspaper's website, because after all that would be readable directly from people's phones at school, that would sharply limit their speech. One case that I appreciate is not squarely on point but relates to the importance of the Internet as a medium is the Packingham case from several years ago from the court, where people who, at that point, they were convicted sex offenders, although they had served their sentence, and they were barred from social media platforms. And one of the arguments the government gave is, you don't have to talk on social media platforms. You can talk on other places. In fact, there are parts of the Internet you can still participate in. And the court said, well, that can't be right. The social media are the modern place for democratic discourse, and that's a place that people have to be able to speak. Well, it seems to me that in all of the cases, and I totally hear you pointing to Alito's concurrent, seem to have some sort of concern with where the speech took place, whom it impacted, and what disruption it caused. You seem to be arguing, no, there's just some things that are so off-campus that it doesn't matter what disruption was caused or whom it might have impacted, provided that somebody, yes, I'll leave that. Is that a position that you would take? Doesn't that even extend beyond what Alito does, which looks to consider things like threats and looks to consider things like whether or not somebody was specifically targeted or activity? Your Honor, I very much appreciate the opportunity to clarify. We are with Justice Alito in the concurrence that, first of all, threats and other unprotected speech remain unprotected. I mean, you could go to jail for a true threat. Surely you could be, including an off-campus true threat, surely you can be disciplined for it. And likewise, Justice Alito does say that there is a difference when it comes to speech that is expressly and specifically directed at the school, school administrators, and others. And we agree with that. And here is the difference. If a school says to students, look, you can say whatever you want to say. Just don't make it personal. Keep your classmates out of it in the sense that don't, if you want to make an argument about transgender athletes, just don't talk about an athlete at your school because that's too likely to create. But that's my whole point. It seems to me that the Supreme Court even is talking about a way of looking at the disruption that was caused and looking at how closely connected the speeches to the school and calibrating. So something that might not cause that much disruption but was actually between the four walls of the school will be more regulatable than something that is so further attenuated. And what we need to do is look at the connection with the school in connection with the disruption that it caused on campus. And if that is appropriate, then it's not quite a balancing, but it's a looking at how they're impacting each other. And what is wrong with that? Your Honor, we think that what is wrong with that is that that would essentially leave no safe harbor for students to express their views on highly controversial political topics outside school. Well, how can that be true? Because if it didn't bleed into what was happening at school, then it wouldn't. Like to Judge Robinson's point, if you just show it to your cousin who has no connection with the school and it dies there, you can say whatever you want. It seems to me that you are trying to adopt a standard that can actually influence the school and the people in it without having to bear any sort of the consequences for the disruption. Is that what you think your client is entitled to? Your Honor, we think that yes, but we think for a good reason. So let's say that somebody wants to express his views. Again, returning to the Israeli-Palestinian conflict, perhaps. And that person wants to express it not just to a cousin, but wants to express it to the public, wants to write a letter to the editor, wants to post a tweet or whatever else. They're aware that there may be people who would be very upset at that because they sharply disagree with the viewpoint. And those people, as this very case illustrates, can help bring about the disruption at school by publicizing and sharply criticizing this and encouraging classmates to make a big thing of it at school. As to some measure, classmates are entitled to speak about it at school. But the consequence is that somebody will know that if they speak again about the Israeli-Palestinian conflict, in any way that third parties might generate a disruption based on or might highlight. Isn't that also true for threat analysis? Like if somebody made a threat and somebody didn't react, then the whole premise of the things that are not protected speech come with an assumption that someone is going to react to hearing it. The fighting words, the threats, the shouting fire in a crowded theater. If nobody moved, there wouldn't be a problem. But why is there something special about the speech that you're articulating that suggests that the reaction is the fault of the hearer as opposed to something regulable by the sayer? Your Honor, it is precisely because it is not a true threat, precisely because it is not fighting words. There are particular exceptions to First Amendment protection that the Supreme Court has recognized. And the basis is because someone is likely to react, right? But somebodies were likely to react in particular ways.  So we can't say that it was the fault of the people who reacted to the speech and say that there's nothing to be done. Your Honor, I think that is in fact the right thing to say outside the existing categories of First Amendment unprotected speech and this expressly and specifically directed example that Justice Alito points to because of the heckler's veto doctrine. The whole point of the heckler's veto doctrine is once you get outside of fighting words, which is a form of fighting words, the exception is a form of heckler's veto, but once you get outside of that, once you get outside of a few other such unprotected categories, if let's say a police officer sees a speaker on the street corner causing a disruption in that people are very upset, maybe as a result they are blocking the sidewalk, maybe they are starting to throw tomatoes at him or threatening him, the police officer can't say, well, this is disruptive, we're going to shut up the speaker precisely because of the heckler's veto doctrine. I mean, there have been arguments that the governments have made that police officers should be able to restrict the speaker in that situation because of the disruption the speaker causes and the whole point of the court's rejection of the heckler's veto doctrine. But that's different in the K-12 setting. I mean, you're not going to dispute that we have a higher, we give administrators a higher latitude for minimizing disruption in this K-12 setting. It's not endless, but they have more, right? Your Honor, it's true they have more. It's also true, as you point out, that it's not endless, and we think the end comes when the speech itself is not in the K-12 setting. It's true that there might be disruption as a result in the K-12 setting, but that cannot justify the administrators asserting 24-7 control over out-of-school speech. To give another example, imagine somebody is engaged in, who's not even a student, but is engaged in public speech around the city, that the students get very upset at. They're not a classmate. It's just they're upset at the fact that this Perot-Hamas speaker is organizing a rally on the quad, and everybody's abuzz about it. I take it the government cannot say, okay, we're going to suppress the rally because it's causing disruption at school. Likewise, we think the government should not- Yes, but I don't understand why that would be even comparable. What is the lesson for this question here in that? Your Honor, the reality is the way that Tinker has been applied in various cases. It has been applied to authorize, at least many lower courts have applied it, to authorize a form of heckler's veto, that, indeed, a student's speech on campus can be restricted because of a fear of disruption. But we think, and I think Justices Alito and Gorsuch, I think, paved the way for this, we think that that cannot extend to the students' off-campus speech any more than it can extend to others' off-campus speech. Can I- No, actually, I'm not done. Sorry, so, yeah, I have two questions. One is, just doctrinally, I'm trying to figure out, you know, viewpoint discrimination, as you pointed out, public, foreign, private, foreign, unlimited, you know, there's all sorts of ways where it fits into our First Amendment doctrine. When I read the school cases, I don't read, other than maybe at the most meta level, viewpoint discrimination as being a factor that's been identified as a consideration. I mean, Bong Hits for Jesus was a very viewpoint discriminatory analysis. And so what are you proposing? Are you proposing that it's some distinct analysis that applies independent of sort of the school regulation context, or it's a factor to be considered in the school regulation context that hasn't previously been identified as such? Yes, Your Honor. So, first, Tinker itself does discuss viewpoint discrimination. One of the things that it mentions is that the armbands were restricted, even though apparently the wearing of an iron cross, which at times is associated with Nazism, was not restricted. And in particular, it uses that as an illustration that it was the viewpoint itself that was being targeted. We think also Justice Alito's concurrence talks about it by just articulating, again, the bedrock principle, and I quote, this is page 205 of Mahanoy, that speech may not be suppressed simply because it expresses ideas that are offensive or disagreeable. Okay, let me ask you another question, please. I thought when you and I had an exchange at the beginning of your argument that we were on this, you acknowledged that there may be a category of speech that is threatening, not in a true threats way and not in a particularized way, but threatening enough that, for example, students in the targeted class would feel unsafe at school, and that that may well be within the realm of regulation. Did I miss, because then later when you were reciting the exceptions, you sort of narrowed it back. Your Honor, I hope I did not suggest that we endorse a threats exception that's broader than the true threats exception. Right, okay, so your idea of the reach of school regulatory authority is that it stops at the edge of true threats as we understand it in what I'll call the adult First Amendment context. Your Honor, we think so, although perhaps one of the things I was suggesting is that in interpreting kind of the how a reasonable person might understand a statement, you might take into account the age of the listeners. So it may be that especially a 10 or a 12-year-old would feel threatened about something that someone else might not be. But here again is where we think that attention to Justice Alito's point about expresses ideas that are offensive or disagreeable might be helpful, the viewpoint discrimination. Right, but one person's offense is another person's fear, and that's really where I'm struggling. And I have a hard time as a judge figuring out whether somebody else's fear is really just offense. Your Honor, that is certainly right, but that has to be done unless the threats exception or some broadening of the exception swallows the rule. Can we come back one more? Yes, of course. Thank you. I appreciate the presider's latitude. So we have language that says that schools are laboratories of democracy and that people should be testing ideas. And we also have doctrine that says schools are supposed to teach people civility matters and being sensitive to other folks. How do we square these? Your Honor, one very useful dividing line is the schoolhouse story. That within the schoolhouse, the Frazer doctrine, for example, allows restrictions of vulgarities. But Mahanoy, of course, involved vulgarities. In Mahanoy, the speech was much more vulgar than in Frazer itself. And the court said, well, that can't be punishable. So that was true as to kind of the Frazer exception. We think the same thing applies as to Tinker. That within the school, and as Morsi Frederick points out, school-sponsored functions as well. Within that context, the school may have a good deal of latitude to restrict speech that is genuinely disruptive in this course, in the service also of promoting civility. But outside school, it cannot teach civility norms by suppressing speech because it thinks that it conveys, for example, a racist viewpoint or anti-Semitic or anti-Palestinian or whatever. Thank you. Appreciate it. May it please the court, Stephen C. Stern, Sokoloff Stern, LLP, for the appellees. The court in Mahanoy deliberately declined to set the absolutist rule that the appellant and Amici proposed. The majority in Mahanoy specifically rejected the Third Circuit's holding that Tinker doesn't apply to off-campus speech. And the distinction, I think, that counsel is making with respect to his argument about off-campus speech really ignores the fact that the majority overruled the Third Circuit's determination that Tinker doesn't apply. I find this phraseology, Tinker doesn't apply. What Tinker stands for is that you don't lose your First Amendment rights when you come into the schoolhouse door. There may be some limitations. So when you say Tinker applies outside the schoolhouse, that feels tautological to me. Of course you have First Amendment rights outside. You have First Amendment rights, but the substantial disruption standard in Tinker still applies outside of the school context. If in Tinker other students had taken offense at the armbands, and predictably so, would that have made the wearing of the armbands subject to regulation within the school? Well, in Tinker the court found there wasn't a substantial disruption. And we have a very different situation here in this case. Here's why I'm asking. In Tinker, the court talks a lot about the fact that they sought to punish petitioners for a silent, passive expression of opinion unaccompanied by any disorder or disturbance on the part of the petitioners. So at least in that particular place, they're tying the lack of disturbance to the conduct of the petitioners, not the organizing or reaction that might come about in response. And I'm trying to figure out whether I'm reading it too narrowly or whether Tinker actually stands for the proposition that in whatever context we're saying you can reach, and I realize that's sort of the central question here, that the predictability of adverse reaction that would be disruptive in the school is enough. Well, there certainly is an element to that in the Tinker decision and the cases that have followed whether there's a reasonable forecast of a substantial disruption. And there and in Mahanoy, they didn't have that. So the quarterback of the football team comes out as transgender on Instagram. She posts a picture of herself in a dress. You can be sure that the school is going to go nuts. It is going to be a huge deal. It's going to be disruptive. People aren't going to be paying attention. Some people may be very upset about it. Is that speech that can be regulated? There's a big difference here. The line that the appellants asked this court to draw based on the concurrence was a line that the majority in Mahanoy declined to draw. They left the questions very open for this and the other circuit courts to decide. Now, if you take that speech in the school context itself, the quarterback's dressing up and there's a debate about trans students or there's a debate about the war. These might be issues that you could discuss in a civics class. But if you take this case, Leroy, inside the school context, and if these boys had gone into the parking lot and reenacted the George Floyd murder in the way that they did, by one boy having his knee on the neck of another boy with the thumbs up and the slogan, cops got another, you can be sure that that's predicted to cause a disruption and would cause a disruption. Does it matter if the student comes in and says, Whoa, turns out it was him handed, but I was trying to make a commentary on the callousness of the police and the disregard for the value of human life. I wasn't making light of anything. Different question. No, is it? I mean, the communication is exactly the same. The thing that's posted is exactly the same. The reaction is exactly the same because nobody's bothering to ask what his intent was. And I think that as a member of a school community, there's a responsibility by the student to communicate in a manner that's not going to cause a disruption. Schools have a very difficult task with enforcing anti-discrimination policies and laws. Under DASA, schools are responsible for enforcing laws, for enforcing their anti-discrimination policies with respect to off-campus conduct that may affect students on campus. So if you want to look at intent, Mahanoy leaves the question open, but Mahanoy also did say that there would be a heightened burden for political or social commentary. Case Leroy testified, I didn't really know what I was doing. I didn't really mean anything by it. That's the record in this case. But all reasonable interpretations and the hearing officers' findings and pretty much everybody who perceived it, including the boys who were involved in it, understood what this message was. It may have been intended as a joke, but the reasonable interpretation, the message was, cops got another black guy. It's the 2020s version of a southern lynching. And if you look at it also, when we talk about the reasonable disruption, you look at it in the context of the time. After the George Floyd murder, there were protests. It was the largest collective protest in American history, and it went international. There were, I think, over 2,000 cities where there were protests. The National Guard was brought in. The military was brought in. There were riots. I mean, this is, and this conduct took place. It seems like you're suggesting that the more current and volatile an issue is in the public conversation, the less protected a high school student is in engaging in the debate that the public all around them is engaging in. No, what I'm suggesting is that there was a very reasonable and substantial forecast of disruption when this was posted on social media on the wake of the verdict in the Derek Chauvin case, the day when the jury was deliberating, and you couple that with the actual evidence in our case, that the boys were getting hundreds of messages themselves in response to their post that went viral, and the school, even the night before. I mean, we have 70-something pages of e-mails between April 19th and 20th, with, I think, only one from the 21st, but we have 70-something pages of e-mails. So why is that? Help me understand this. After Leroy posted it, it stayed up for, took it down, how long, how much later? Maybe 10 or 12 minutes. There's different testimony. And the dissemination was by his ex-girlfriend, who took a screenshot of it and blasted it on social media. So that's in the brief, but not in the record. I don't believe there's been any testimony that this was Leroy's girlfriend. Well, it was somebody else. Well, it was why, first of all, Case Leroy disseminated it to all of his followers, Snapchat followers. And I think Your Honor said something earlier about, you know, today's day and age with social media. I have children in high school and college, and all their communications with their friends are on social media, even if they're sitting in the same room. It's an instantaneous message that circulates to everybody they know, and a large portion of the students of his followers or those friends on Snapchat were students in his class. So is that the part of it? That's where I was hoping you would get to. Is that the part of the conversation that links up the connection to the school? Like, if it had been not—I mean, it seemed to me the idea behind Justice Alito's concurrence is that the closer you have the relationship to the school, you know, you have more authority to regulate, even if the disruption is lower. But the further the relationship is to the school, the disruption has to be greater. If that is true—or if you disagree, you should tell me that you don't agree— but if that is true is the fact that he voluntarily chose to speak to school actors, people in the school community, kind of tie himself to the school in a way that if he had posted to, you know, an op-ed, or if he had written an op-ed, would be different. So two things that I would say in response to that. Number one, the majority did not so restrict the application of Tinker to the off-campus context. So it's kind of an open—it's open for courts to evaluate that, both on, you know, the conduct of the speaker and the disruption. I'm not sure that it's pigeonholed one way or the other. But certainly in today's day and age, the means of communication brought this right to the school. I mean, the response— Not just the means, the speaker brought it right to the school. Absolutely. By choosing to send it to people that he knew were in the school with other members of the school brought it to the school. There's no question about it. Okay, but if that's true, then—and I do think that that's where the Mahané decision becomes in play. There she named her school cheer team, the other teachers, the school that she was in, and they found that that wasn't enough. So why is this case, where none of that was done, put us in a regulable land? Because in Mahané, they found that there was insufficient evidence of disruption. Okay, so— And it was— So that's, again, you look at the disruption, and the greater the disruption, the more permission—  Okay. So in Mahané, I want to get away from the concurrence for a minute and talk about the majority opinion that establishes the governing law, right? And there are features of opinion in this speech that the court focuses on to help us assess particular sets of facts. And interestingly, one of the features or one of the interests that the court lays out is the interest in protecting unpopular expression to nurture the marketplace of ideas. Essentially, a school has an interest in teaching civics, teaching First Amendment values as we sort of historically understood them as a country. How does that play in here? I mean, I get the school having the assembly, condemning the speech. All of that seems very consistent with that rationale. But I'm wondering about the punitive part of it. So schools have a responsibility, yes, of course, to engage in the marketplace of ideas and educate children, but also to protect students. And that's not just physically. Protect them physically and emotionally. Many of the emails in the record express—were students expressing that they didn't feel safe in school. And so federal state law, DASA, all require schools to protect students. And not just protect students, but educate them against discrimination. Protect them against discrimination. So in terms of the punitive aspect, I mean, there's a code of conduct. And the school determined, and there was due process, there was a hearing, et cetera. The school made a determination that this was a violation of their code of conduct. Rules and regulations that are in place as part of the educational mission to educate students on accepting others, not engaging in discriminatory conduct. Right. And without that— So I'm wondering, you said something that makes—this is a line I was exploring with your colleague across the aisle. The line between sort of protecting people from being deeply offended and protecting people from fearing for their safety. Is that a workable line? Is that something that, from your perspective, is a way to distinguish the kinds of speech that schools can reach versus the kinds that it's not? And then we can fight about what falls on which side of the line? Or do you think that protecting students who are deeply offended but aren't actually fearful of their safety is still within the realm of what the school can regulate? I think there is a line, and courts can draw this line in different places. I would certainly draw this line between Mahanoy and this case, where Mahanoy—I believe there was, in the decision, there was a reference to students in a math class or algebra class saying that they were upset that she did this. Okay. That might be hurt feelings. But when you have black students in a school saying, I don't feel safe because these kids reenacted the George Floyd murder with a message of advocacy for it, as if cops got another. And if you actually—there were several messages, right? So there was Case Leroy's message, but it was around the same time as student A's message, which included the BLM logo and set another one down. So you talked earlier with Mr. Volokh. You asked him questions about the true threats. I think there's certainly a reasonable interpretation here that these students were threatened, if not by name. They had a right to feel threatened by this. If I may. So one of the things that the doctrine doesn't seem to leave a lot of room for are the tough position that schools are in, where they both have a duty to protect people and to create an environment, but they also have a duty to promote and protect speech. And my question is, is there anywhere in First Amendment doctrine that puts some play in the joint for them getting it wrong? For them to be like, we have a good faith way where this is a close call, this is one of those bubble First Amendment cases, this isn't exactly like Mahoney or Tinker. We did our best here, and maybe a court looking at it with time and the benefits of other cases could reach a different conclusion, but we're going to be in a position where we were right enough and acting in good enough faith in accordance with our due process and we had a hearing. Is there any room in the doctrine for that at all, or none that you see? Listen, this court, there's language in many of the cases where this court has dealt with the decisions of school administrators and affords them deference because they're the professionals that are running their educational institutions and deal with students on a daily basis and have the background and knowledge and experience to make determinations as to what's in the best interest of the school and to protect the student's safety. And not just safety, prevent a substantial disruption of the educational environment. Sure, not everyone's always going to get it right, and those cases will have to come to the courts. Are there qualified immunity cases in this context? Or is that a defense? It's certainly for individuals. Qualified immunity might be available. You know, in this case, the appellant named the Superintendent Evans in his official capacity, so we argued that the claim should be dismissed against him because it's the same as a claim against the school district itself. In their reply for the first time before this court, they said, no, no, we meant to name him individually. If that were the case, I don't think that's a viable argument, but if that were the case, at a bare minimum, he would be entitled to qualified immunity. I mean, this situation will happen before the Mahanoy case was even decided. But certainly, yeah, there's room for qualified immunity. I mean, with the use of social media by children, the prolific use of social media, there's going to be a lot of cases like this. I would submit that this one falls very solidly on the side of the school district based on the speech, the forecast of disruption, and the disruption itself. I think we've got your argument, so appreciate it. Thank you. And we're going to hear from Attorney Volokh, and we are going to hold you three minutes. Yes, Your Honor, and I appreciate all the time that you have given me already. I just wanted to highlight a couple of things from the argument that we've heard. One is that it's the responsibility of the student to communicate in a manner that won't cause disruption. I think that captures quite well the school's position. But what that means is it's the responsibility of a student not to communicate at all on certain subjects that the student is aware or should be aware are so incendiary that they're likely to cause disruption. Let me ask you this, and this is just a riff on the hypothetical I asked you. Suppose in the run-up to the posting of a photograph with Hamas and a Jewish victim, there had been at the school a series of incidents. Three or four Jewish families in the school, swastikas painted on the lockers, poured into the books, and so forth and so on. And in response to those, the principal had said, look, we don't know who's done this, but this is not who we are. This kind of thing has to stop. It will not be tolerated, and it's bad for this reason, that reason, the other reason. And then we have this incident. Does that change the calculus in any way? Your Honor, under certain circumstances, it might. Because it is clear that what does constitute a true threat and what doesn't has to turn on the context just because that's how words are understood. So if I were to say, oh, you know, I really like the fact that the Dodgers beat the Yankees, well, OK, that's one thing. But if there was somebody who had been attacked at school with baseball bats saying, you damn Yankee, then in that case, it's possible that in context, that very statement, which is usually innocent, would be perceived as a true threat. But it would require some such context. We don't know of any such here. Another thing that I think is important about what the defendants were saying is the concern here is about the school needs to teach the impropriety of discriminatory conduct. That is surely so. But here, the discriminatory conduct that they're referring to is the posting of this image. What they are describing as discriminatory conduct, which, in fact, is sometimes so labeled, is speech that supports or can be interpreted as being racist or anti-Semitic or anti-Palestinian or what have you. So what they're really saying is schools have a responsibility and a power to restrict bigoted speech off campus. And that's what we think the First Amendment does not allow. All right. Thank you very much. We appreciate all of your arguments. We've kept you a long time. And we appreciate all your- And, in any case, well-briefed, well-armed. Thank you all very much.